2014-1620, -1621, -1622, -1623

# United States Court of Appeals
# for the Federal Circuit

GAMETEK LLC (now known as GT Gaming LLC),

Plaintiff-Appellant,

v.

ZYNGA INC. and ELECTRONIC ARTS INC.,

Defendants-Appellees,

and

FUNZIO, INC., FUNZIO USA, INC., GREE INTERNATIONAL, INC.,
CROWDSTAR INTERNATIONAL LIMITED, CROWDSTAR, INC., and
CROWDSTAR NETWORK, LLC,

Defendants-Appellees,

*Appeals from the United States District Court for the Northern District of
California in consolidated case nos. 3:13-cv-02546-RS, 3:13-cv-03089-RS, 3:13-
cv-03472-RS, and 3:13-cv-03493-RS, Judge Richard Seeborg*

## OPENING BRIEF OF PLAINTIFF-APPELLANT

Date:  September 12, 2014

*/s/ John J. Edmonds*
John J. Edmonds
Stephen F. Schlather
Shea N. Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone:  (281) 501-3425
Fax:  (832) 415-2535
jedmonds@cepiplaw.com
ATTORNEY FOR PLAINTIFF-
APPELLANT GT GAMING LLC f/k/a
GAMETEK LLC

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, undersigned counsel for Plaintiff-Appellant hereby certifies that:

1.    The full names of every party or amicus represented by me is:

GT Gaming LLC f/k/a Gametek LLC

2.    The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Plaintiff-Appellant's ultimate parent is Acacia Research Corporation, a publicly traded company.

4.    The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the District Court or are expected to appear in this Court are:

John Edmonds, Stephen Schlather, Henry Pogorzelski, Johnathan Yazdani, and Shea Palavan of COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC.

Dated: September 12, 2014                    */s/ John J. Edmonds*
                                             John J. Edmonds

TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

    Cases ................................................ **Error! Bookmark not defined.**

    Statutes........................................... **Error! Bookmark not defined.**

STATEMENT OF RELATED CASES ......................................................v

I.   STATEMENT OF JURISDICTION...................................................1

II.  STATEMENT OF THE ISSUES........................................................2

III.   STATEMENT OF THE CASE ........................................................3

IV.   STATEMENT OF THE FACTS ......................................................4

    A.  The '445 patent...................................................................4

    B.  Prosecution history of the '445 patent.............................9

    C.  Claim Construction.........................................................11

    D.  The District Court's Erroneous Section 101 Patentability Ruling..............14

V.   SUMMARY OF THE ARGUMENT..............................................14

VI.   APPLICABLE LEGAL PRINCIPLES ..........................................16

    A.  STANDARD OF REVIEW .................................................16

    B.  LEGAL FRAMEWORK FOR THE § 101 ANALYSIS ............17

VII.   ARGUMENT .................................................................................19

    A.  The District Court erred in finding the '445 claims to be directed to an abstract idea. ...................................................19

B.   Even if the District Court was correct in distilling an abstract idea from the '445 claims, the abstract idea that it distilled was erroneously broad, thus causing the District Court to erroneously conclude that the '445 claims failed to provide "meaningful space" for gaming activities, and that they would effect a "disproportionate" burden on one's ability to practice the abstract idea. ..........22

C.   The District Court erred in failing to find that, at a minimum, meaningful limitations or the "inventive concept" in the claims render them patentable.....24

D.   The District Court's "meaningful space" test is legally erroneous. Alternatively, the District Court erred in holding that the '445 claims failed to provide "meaningful space" for gaming activities. ............................................28

E.   The District Court erroneously held that the "tracked activity" limitation in the claims effects a "disproportionate" burden on gaming. ...............................30

F.   The District Court erred in holding that the purchasing steps (e to g) are "akin to the purchasing steps in Bilski to provide a commodity to a consumer." .......31

G.   The District Court erroneously found that the claim limitations are "nothing more than a teased-out version of the basic steps of any commercial transaction." ..................................................................................................................32

H.   The District Court erred in failing to appreciate how implementation of the method steps by means of a computer differs substantively from non-computer gaming methods. ...............................................................................................33

I.   The District Court erred in finding that the '445 claims fail to satisfy the machine-or-transformation ("MOT") test..........................................................35

VIII.   CONCLUSION AND PRAYER.................................................................38

VII.   CERTIFICATE OF SERVICE..................................................................39

VIII.   CERTIFICATE   OF   COMPLIANCE   WITH   TYPE-VOLUME LIMITATION,   TYPE-FACE   REQUIREMENTS,   AND   TYPE-STYLE REQUIREMENTS.................................................................................................40

ADDENDUM ........................................................................................................41

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
134 S.Ct. 2347 (2014)................................................... 17, 18, 19, 20, 24

*Allergan, Inc. v. Athena Cosmetics, Inc.,*
640 F.3d 1377 (Fed. Cir. 2011).................................................. 16

*Bilski v. Kappos,*
561 U.S. 593 (2010)................................... 20, 27, 29, 32, 33, 35

*buySAFE, Inc. v. Google, Inc.,*
--- F.3d ----, 2014 WL 4337771 (Fed. Cir. Sept. 03, 2014)................... 18

*CLS Bank Int'l v. Alice Corp.,*
717 F.3d 1269 (2013)................................................. 27

*Diamond v. Diehr,*
450 U.S. 175, 101 S.Ct. 1048, 67 L. Ed. 2d 155 (1981)................... 27, 29

*Dworkin v. Hustler Magazine, Inc.,*
867 F.2d 1188 (9th Cir. 1989)................................................ 16

*Gottschalk v. Benson,*
409 U.S. 63 (1972)................................................. 19, 29

*In re Bilski,*
545 F.3d 943 (Fed. Cir. 2008) (en banc)................................ 36

*In re Ferguson,*
558 F.3d 1359 (Fed. Cir. 2009)................................................ 35

*Le Roy v. Tatham,*
14 How. 156, 14 L.Ed. 367 (1853)................................... 19

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
132 S.Ct. 1289 (2012)............................... 17, 18, 20, 23, 24, 27, 28, 29, 31

*Parker v. Flook,*
437 U.S. 584 (1978)................................................. 19, 29

*SRAM Corp. v. ADII Eng'g, Inc.,*
465 F.3d 1351 (Fed. Cir. 2006)................................................ 17

*Turner v. Cook,*
362 F.3d 1219 (9th Cir. 2004)................................................ 16

*U.S. Bancorp v. Solutran, Inc.,* Case No. CBM2014-00076,
2014 WL 3943913 (PTAB Aug. 7, 2014)................................ 22

## Statutes

35 U.S.C. § 101................................................................. 17
35 U.S.C. § 282................................................................. 17
Fed. R. App. P. 4................................................................. 1

## STATEMENT OF RELATED CASES

Other than the related cases consolidated for this appeal, there have been no other appeals before this or any other appellate court stemming from the civil action giving rise to this appeal.

# I.  STATEMENT OF JURISDICTION

Plaintiff-Appellant, GT Gaming LLC f/k/a Gametek LLC ("GT"), brings this Appeal from the United States District Court for the Northern District of California (the "District Court") to the United States Court of Appeals for the Federal Circuit in accordance with 28 U.S.C. § 1295(a)(1). *See* Fed. R. App. P. 4(a)(4)(B)(i).

This is a case arising under the United States Patent Laws and jurisdiction exists in accordance with and pursuant to 28 U.S.C. §§ 1338(a) and 1400(b). GT is appealing the order of the District Court finding the claims of the patent-in-suit to be unpatentable under 35 U.S.C. § 101. These orders are final because final judgment was entered in each of these cases on April 25, 2014. (A0001, A1808, A2682, A3552).

This appeal has been timely taken within  thirty (30) days of the entry of final judgment pursuant to 28 U.S.C. § 2107. Final judgment was entered on April 25, 2014 (A001), and GT's notices of appeal was filed on May 7, 2014. (A1785, A2659, A3529, A4399).

## II.    STATEMENT OF THE ISSUES

1.  Whether the District Court erred in finding the claims of the '445 patent to be unpatentable under 35 U.S.C. § 101;

2.  Whether the District Court erred in finding the claims of the '445 patent to be directed to an abstract idea; and, alternatively, whether the District Court erred in defining the abstract idea too narrowly;

3.  Whether the District Court erred in finding insufficient meaningful limitations for transforming any claimed abstract idea into a patent-eligible application; and

4.  Whether the District Court erred in applying a "meaningful space" test; or, alternatively, whether it erred in at least implicitly finding that the '445 claims are unpatentable for preempting an abstract idea.

## III.    STATEMENT OF THE CASE

This matter is the cosolidated appeal of four District Court cases in which GT sued Defendants- Appellants for infringing U.S. Patent No. 7,076,445 ("the '445 patent").  On April 25, 2015, the District Court rendered judgment on the pleadings that all claims of the '445 patent are unpatentable under 35 U.S.C. § 101 because they are directed to abstract ideas. (A0001, A1808, A2682, A3552).  The basic holding of the District Court was that, "[i]n sum, the '445 patent provides no meaningful limitations on the underlying abstract idea" of "allowing players to purchase additional objects during a game." (A0014).

Following entry of judgment, (A0001, A1808, A2682, A3552),  GT timely appealed to this Court. (A1785, A2659, A3529, A4399).

## IV.   STATEMENT OF THE FACTS

### A. The '445 patent.

Although the '445 specification discloses multiple things, the *claimed* invention pertains to novel video game embodiments comprising offers for game objects (for example, ammunition) being made based upon the tracked activity of the user, in-game purchases being made for monetary consideration, and incorporating such objects into a game, all done in a real-time process without the purchase interrupting the gaming action.[1] There is nothing abstract about this. The claimed invention comprises specific implementations of a programmed computer for managing video games in specific ways.

Exemplary claim 1 of the '445 patent, which was the focus of the District Court's ruling, covers the following:

> 1. A method of managing the operation of a game which includes a game environment, and is programmed to control a gaming action for at least one of a plurality of users, said managing method using a programmed computer to effect the following steps:
>
> a) tracking the activity of the at least one user in the course of the gaming action;

---

[1] The District Court erroneously wrote that, "[a]lthough the claim preamble requires "us[e of] a programmed computer to effect" the claimed method steps, the specification suggests the method may be performed with or without a computer." (A0006). This was erroneous because the language of the claims defines how such methods are performed. Unclaimed methods and apparatuses in the specification, especially after the claims changed substantially over years of prosecution, do not define how the methods in the issued claims are practiced.

b) permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics;

c) determining the eligibility of the at least one user to purchase at least one of a plurality of game objects, said eligibility determining comprises the following sub steps:

      i) permitting the at least one user to select the at least one game object,

      ii) setting the purchase price of the at least one game object, and

      iii) comparing the account balance of the at least one user's consideration with the set price of the at least one game object and, determining if the balance of the user's consideration is not less than the set price, determining the at least one user to be eligible to purchase the at least one game object;

d) displaying in the game environment a purchase price of the at least one game object;

e) presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the at least one gaming action of the at least one user and, the one game environment or the one set of demographics of the at least one user

f) permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the gaming action of the at least one user; and

g) supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user and incorporating the game object into the game.

A0035, 11:54-12:27.

The two other independent claims, which are claims 15 and 17, differ in

certain respects from claim 1, including that neither comprises the programmed

computer effecting the use of user demographic information, and both comprise the

programmed computer effecting the presenting of offers to purchase game objects

dependent upon a group of game parameters comprising the tracked activity of the

user (as contrasted with claim 1 which comprises the programmed computer

effecting the presenting of offers to purchase game objects dependent upon a group

of parameters comprising user tracked activity, the game environment, or user

demographics).  A0035. Claims 15 and 17 are indeed narrower, and thus necessarily

less abstract, than claim 1.

Each claim expressly recites a machine – a programmed computer. This

programmed computer performs at least twelve specific steps which are performable

underline only by a programmed computer.

In described embodiments covered by the claims (as opposed to unclaimed

methods and apparatuses in the specification which were excluded by substantial

narrowing of the claims over a lengthy prosecution spanning six years), the

invention(s) of the '445 patent comprise methods for transacting and integrating in-

game advantages in the form of integrated game objects to users of interactive

gaming applications, wherein a participating user may obtain, in real time and upon

payment of consideration, access to game objects for use and/or placement in the

game. A0035, 2:63-67. Users have the ability to purchase game objects, for example

ammunition and resources, using various currency means. A0035, 3:1-13 & 5:15-

17. The claimed purchase and supply process is "realized through a true two-way, real time transaction system, allowing participating users to continue in their experience without the interruption of processing payment information." A0035, 3:55-58. This is exemplified by Fig. 4A of the '445 patent, wherein a user with an account balance of $4.35 can, while still shooting and/or and navigating in the gaming action, purchase additional ammunition for $.30 by pressing [Alt-A] or purchase a rocket launcher for $.75 by pressing [Alt-R], as follows:



## Figure 4A

This "real time" aspect ensures that the purchase and supply of the game object into the game does not interrupt the gaming action, thus enhancing game play and making in-game purchases easier, more fluid, and more desirable to conduct. The purchased game objects are integrated and incorporated into the electronic game. A0035, 3:4-

8.

In accordance with, for example, the "demographic" or "tracked activity" limitations in the claims, the computing environment stores a profile of the user so that game objects may be offered in accordance with a user's profile. A0035, 3:58-60. To effect a purchase transaction for a real-time, in-game purchase of game objects the programmed computer checks the profile and account balance of the requesting user to see if he or she is qualified for the game object. A0035, 6:35-38. If the user qualifies, the user's account is debited and the requested game object is provided. A0035, 6:38-40. For example, a user navigating in a computing game environment requests more ammunition. A0035, 6:42-43. The user is processed (*e.g.*, checked for tracked activity and account information) and, if qualified, receives the ammunition immediately and without interrupting the gaming action. A0035, 6:43-45. This permits the user to continue in their computing game environment (*i.e.*, continue playing the game) without transaction processing interrupting the gaming action. A0035, 6:45-48.

FIG. 1 shows computing system 100 that may support the invention. A0035, 6:57-58. *See, e.g.,* A0035, 6:58-64 & 7:3-12. FIG. 1A is a system diagram of an exemplary computing network environment for implementing the invention. A0035, 4:17-19. *See, e.g.,* A0035, 7:62-8:7. FIG. 2 is a screen shot of an exemplary gaming computing application offering game object advantages to participating users.

A0035, 4:23-24. *See, e.g.,* A0035, 8:20-38. FIG. 4A shows a screen shot of an exemplary computing game application 413 describing exemplary integration and real-time transaction features. A0035, 9:14-16. *See, e.g.,* A0035, 9:16-26. FIG. 5 describes the general processing performed in a preferred embodiment of the invention. A0035, 9:42-64.

**B. Prosecution history of the '445 patent.**

The '445 patent underwent a lengthy prosecution history spanning almost six years, which involved seven (7) Office Actions, in which numerous iterations of the claims were rejected over prior art. *See* A0850-A1523 (the '445 patent file history labeled "FH"); FH174-183; FH197-205; FH234-241; FH307-314; FH339-346; FH367-378; FH432-441. After the original claims had been revised at least eight (8) times (FH111-121; FH189-193; FH209-233; FH243-253; FH298-303; FH316-336; FH349-362; FH404-428), the closest prior art was U.S. Patent No. 6,616,533 to Rashkovsky, et al.

The Examiner wrote that, Rashkovsky "teach[es] interrupting game play to allow a user to purchase objects related to a game such as action figures." Indeed, the language cited by Examiner from the Rashkovsky patent discloses a system in which advertisements may be viewed while the game is "paused" and purchases of associated items may be made after the game is over.

After the seventh office action, which had been based upon Rashkovsky, the

Applicant and Examiner had an interview (FH168-171), wherein they discussed "suggested features that Examiner feels best characterizes system, including: By offering the [game object] feature in this manner back-end financial processing is avoided and the user has 'real-time' and instant access to the feature. While the user is playing the game is updated by adding the new feature and the user continues play with the new feature." FH171. Thereafter, Applicant amended the claims to add the "without interrupting" limitation, FH111-122, and the claims were allowed. FH47-53.

On March 9, 2006, the Examiner issued a "Notice of Allowability." FH47. In the "Reasons for Allowance," the Examiner reviewed the closest prior art of record, and wrote that it fails to "disclose offering a game object to a user for a price and allowing said user to access and incorporate said object in a game without interrupting the game." FH50.

As noted above, "without interrupting" means that a "transaction occurs in a real time two-way transaction" which allows the user to receive a game object "immediately" and "permits the participating user to continue in their [sic] computing game environment (i.e. continue playing the game) without the usual interruption of transaction processing." A0035, 6:41-48. This contrasts with the system of the Rashkovsky patent wherein the game had to be "paused" or ended in order to purchase items associated with the game.

## C. Claim Construction.

Because patentability was decided on a motion for judgment on the pleadings, the District Court applied GT's asserted claim constructions. (A0001, A1808, A2682, A3552).  As noted by the District Court, (A0007, FN4; A0014), GT's claim constructions are set forth in its Opening Claim Construction Brief in the *Zynga* case. (*see* A0809).  Most pertinent to this appeal are GT's constructions of "interrupting" (or "without interrupting"), "purchase," and "consideration."

In the context of the '445 patent, "interrupting" means that something is "not done in real time" and "without interrupting" means that it is "done in real time." The most pertinent prosecution history is noted above.  More importantly, the specification refers to "without interrupting" in terms of "real-time" transactions that will not interrupt gaming action. For example, it states that: "a participating user may obtain, in real time and upon payment of consideration, access to content, products, and/or services that are only offered to those users who have advanced or extended content, products, or services privileges." A0035, 2:60-3:3. Further, the specification states "[t]he transaction occurs in a real time two-way transaction. For example, a participating user navigating in a computing game environment requests more ammunition. The user is processed and if qualified, received the ammunition immediately--the accounting for which is settled latter. This permits the participating user to continue in their computing game environment (*i.e.*, continue playing the

game) without the usual interruption of transaction processing. A0035, 6:41-48.

With respect to this term, the patentee acted as its own lexicographer. In the specification of the '445 patent, the patentee writes as follows: "Using the present invention, participating users have the ability to 'purchase' these environment features or elements using various currency means, including credit cards, e-cash, e-gold, other Internet enabled currency, and secondary monetary sources, such as, charges to phone or utility bill, transferring credit on pre-paid phone cards, or transit passes, or through conventional payment methods, such as checks, money-orders or cash." A0035, 9:56-64. GT's construction of "purchase" is verbatim from the specification. (A0035, 3:11-18).

Consistent with "purchases" requiring a monetary nexus as set forth in the patentee's definition of "purchase," the specification also refers to "monetiz[ing]," "pay[ing]," "additional revenue streams for offering advantages," "price," and "cost." A0035, 3:65-4:3; 4:65-5:2; 5:33-37. Further, the specification and claims also describe another important aspect of the invention, which is a "real time" transaction (*see, e.g.*, A0035, 2:65-3:3; 4:54-58; 6:41-48).

The making of an actual purchase with a monetary nexus is related to the '445 patent's novel "real time" financial game transaction which avoids interrupting the gaming action with the purchase.

In addition, each of claims 1, 15, 17, and 18 refer to a "purchase price" and/or

a "set price" for a game object. The use of the word "price" is also consistent with purchases being made with currency means having a nexus to money. Further, and consistent with the specifications discussion of prior art games in which advantages could be obtained by non-currency means, in the Notice of Allowability that facilitated the issuance of the claims, the Examiner noted that prior art such as Age of Empires had in-game object selection but did not disclose "offering a game object to a user for a price." FH47. Thus, the Examiner understood that the purchase limitation added by the patentee distinguished the claimed invention over prior art which did not involve currency means.

In the context of the '445 patent, "consideration" means "that which is used to make a purchase within the game." Indeed, the specification and claims state that consideration is what is used to make a purchase. *See, e.g.*, Claims 1, 15, & 17. As noted above, the Patentee was his own lexicographer with respect to "purchase," as the term was defined in the specification as having a nexus with "currency means." Since "consideration" is what is used in the specification and in the claims to make the purchase, these terms should be harmonized. Accordingly, "consideration" (which is used in the game to obtain objects or elements without interrupting game play) cannot be construed more broadly than "purchase" (which, as set forth above, requires a monetary nexus and is used to obtain consideration used in-game or during game play).

**D. The District Court's Erroneous Section 101 Patentability Ruling.**

In sum, the District Court erroneously held that the '445 patent "embodies the abstract idea of allowing players to purchase additional objects during a game," (A0008), that it "provides no meaningful limitations" on that abstract idea. (A0011; A0014).

## V.    SUMMARY OF THE ARGUMENT

The District Court erred in finding the claims of the '445 patent to be directed to an abstract idea. The claims of the '445 patent, including exemplary claim 1, are directed to specific and concrete methods of managing and controlling gaming actions involving twelve concrete and specific steps such as limiting offers based upon tracked game activity and effecting real-time transactions which allow the purchase and integration of game objects into the game without interrupting the gaming action.  They simply are not directed to an abstract idea.

Even if the District Court was correct in distilling an abstract idea from the claims, the abstract idea that it distilled was erroneously broad, thus causing the District Court to erroneously conclude that the claims failed to provide "meaningful space" for gaming activities, and that they would effect a "disproportionate" burden on one's ability to practice the abstract idea. The twelve  concrete steps in the claims – especially at least managing the operation of a computerized game, controlling a user's gaming action, presenting an offer to purchase a game object dependent upon

a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action (*i.e.*, in real time), and supplying game objects without interrupting gaming action (*i.e.*, in real time) – need to be embodied in any statement of any abstract idea embodied by the claims of the '445 patent.

The District Court erred in failing to find that, at a minimum, meaningful limitations or the "inventive concept" in the claims render them patentable. Collectively, the concrete steps in the claims (*e.g.*, a programmed computer managing the operation of a computerized game, controlling a user's gaming action, presenting an offer to purchase a game object dependent upon a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action (*i.e.*, in real time), and supplying game objects without interrupting gaming action (*i.e.*, in real time)), provide "meaningful limitations" and an "inventive concept" that should render patentable any alleged abstract idea embodied with the claims. In particular, aside from the meaningful and significant "tracked activity" limitation on the offer made by the programmed computer within the computer managed and controlled game, the real-time (*i.e.*, without interruption), in-game purchase of game objects which are integrated into the game in real time, is significant, novel and not found in the prior art.

Finally, the District Court erred in failing to appreciate how implementation of the method steps by means of a computer differs substantively from non-computer

gaming methods. Without limitation, a programmed computer is required to manage the operation of a game, to control a user's gaming action, to effect a real time purchase transaction for consideration having a monetary nexus without interrupting the gaming action, and to incorporate a purchased game object into a computer controlled game. Indeed, it was erroneous to conclude that the computerized gaming methods described and claimed in the '445 patent could be implemented without a computer.

## VI.    Applicable Legal Principles

### A. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Such a motion, is "functionally identical" to a Rule 12(b) motion to dismiss for failure to state a claim, differing only in that it is filed after pleadings are closed. *See Dworkin v. Hustler Magazine, Inc*., 867 F.2d 1188, 1192 (9th Cir. 1989). In evaluating a motion for judgment on the pleadings, all material allegations in the complaint are accepted as true and construed in the light most favorable to the non-moving party. *See Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004).

This Court reviews the grant of judgment on the pleadings *de novo*. *See Allergan, Inc. v. Athena Cosmetics, Inc*., 640 F.3d 1377, 1380 (Fed. Cir. 2011).

## B. LEGAL FRAMEWORK FOR THE § 101 ANALYSIS

"A patent shall be presumed valid." 35 U.S.C. § 282. "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *SRAM Corp. v. ADII Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

The Supreme Court has interpreted 35 U.S.C. § 101 to contain an implicit exception that laws of nature, natural phenomena, and abstract ideas are not patentable. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —— U.S. ——, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014). In identifying the three types of excluded matter, the Court has explained that the underlying "concern" is "'that patent law not inhibit further discovery by improperly tying up the future use' of these building blocks of human ingenuity." *Alice*, 134 S.Ct. at 2354. Based on the three implicit exclusions, the Court has created a framework for identifying claims that fall outside Section 101. *Alice*, 134 S.Ct. at 2355; *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, —— U.S. ——, ——, 132 S.Ct. 1289, 1296–97, 182 L.Ed.2d 321 (2012). A claim that directly reads on matter in the three identified categories is outside Section 101. *Mayo*, 132 S.Ct. at 1293.

But the provision also excludes the subject matter of certain claims that by their terms read on a human-made physical thing ("machine, manufacture, or composition of matter") or a human-controlled series of physical acts ("process")

rather than laws of nature, natural phenomena, and abstract ideas. *buySAFE, Inc. v. Google, Inc.*, --- F.3d ----, 2014 WL 4337771, *3 (Fed. Cir. Sept. 03, 2014). In accordance with the Supreme Court's "framework for distinguishing patents that claim … abstract ideas from those that claim patent-eligible applications of those concepts," courts must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 132 S.Ct. at 2355.  Step two of the Supreme Court's "framework" requires that courts consider the elements of the claims and determine whether there is an "element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 132 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1294). This two-stage inquiry requires examination of claim elements both individually and as an ordered combination. *buySAFE*, *supra* at *3; *Alice*, 134 S.Ct. at 2355.

The Court in *Alice* made clear that a claim directed to an abstract idea does not move into Section 101 eligibility territory by "merely requir[ing] generic computer implementation." *Alice*, 134 S.Ct. at 2357, FN1. In so holding, the Court in *Alice* relied on *Mayo* for the proposition that simply appending conventional steps, specified at a high level of generality, was not enough to supply an inventive concept. *Id.* (quoting *Mayo*, 132 S.Ct. at 1300, 1297, 1294). Neither "attempting to limit the use of [the idea] to a particular technological environment" nor a "wholly

generic computer implementation" is sufficient. *Alice*, 134 S.Ct. at 2358 (internal quotation marks omitted).

## VII. ARGUMENT

### A. The District Court erred in finding the '445 claims to be directed to an abstract idea.

The District Court erroneously held that the '445 claims are directed to an "abstract idea of allowing players to purchase additional objects during a game." A0008. The Supreme Court has not provided definitive guidance on what constitutes an abstract idea.[2] The "abstract ideas" category embodies "the longstanding rule that '[a]n idea of itself is not patentable.' *Alice*, 134 S.Ct. at 2355. *See also Le Roy v. Tatham,* 14 How. 156, 175, 14 L.Ed. 367 (1853) ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right"). To this end, the Supreme Court has held that claims involving an algorithm for converting binary-coded decimal numerals into pure binary form,[3] claims involving a mathematical formula for computing "alarm limits" in a catalytic conversion process,[4] claims

---

[2] "[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case. It is enough to recognize that there is no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of intermediated settlement at issue here." *Alice*, 134 S.Ct. at 1357.

[3] *Gottschalk v. Benson*, 409 U.S. 63, 71-72, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972).

[4] *Parker v. Flook*, 437 U.S. 584, 594–595, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978).

involving hedging against risk,[5] and claims involving intermediated settlement[6] are patent ineligible.  For example, in *Bilski* and *Alice,* the Supreme Court relied on the fact that the contractual relations at issue constituted "a fundamental economic practice long prevalent in our system of commerce." *Bilski*, 561 U.S. at 611; *Alice*, 134 S.Ct. at 2356, 2357.

Aside from holding that claims directed to algorithms and fundamental economic practices are directed to abstract ideas, the Supreme Court has also provided the guidance that the "only way" to determine whether claims are merely directed to an abstract idea is to "analyze each claim as a whole, looking at the language of the claims." *Mayo, supra* at 1317.

The claims of the '445 patent are not directed to an algorithm or fundamental practice, and the District Court made no such holding.  Rather, the District Court erred in failing to look at the claims as a whole.  Exemplary claim 1 claims a concrete, detailed and specific method of managing the operation of a video game which comprises twelve distinct steps:

> 1)     a programmed computer effecting the step of controlling a gaming action for at least one of a plurality of users (claim 1, preamble);
> 2)     a programmed computer effecting the step of tracking the activity of a user in the course of the gaming action (claim 1, element a);
> 3)     a programmed computer effecting the step of permitting the user to create an account for receiving consideration (claim 1, element b);
> 4)     a programmed computer effecting the step of determining the eligibility

---

[5] *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010).
[6] *Alice, supra.*

of the user to purchase one of a plurality of game objects, (claim 1, element c) said eligibility determining comprising the following sub steps:

5) a programmed computer effecting the step of permitting the at least one user to select the at least one game object (claim 1, element c(i));

6) a programmed computer effecting the step of comparing the account balance of the at least one user's consideration with the set price of the at least one game object (claim 1, element c(iii));

7) a programmed computer effecting the step of determining if the balance of the user's consideration is not less than the set price (claim 1, element c(iii));

8) a programmed computer effecting the step of determining whether the user is eligible to purchase the game object (claim 1, element c(iii));

9) a programmed computer effecting the step of displaying in the game environment a purchase price of the at least one game object (claim 1, element d);

10) a programmed computer effecting the step of presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the user (claim 1, element e);

11) a programmed computer effecting the step of permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the gaming action of the at least one user (claim 1, element f); and

12) a programmed computer effecting the step of supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user and incorporating the game object into the game (claim 1, element g).

A0035, claim 1. The District Court's oversimplification of the "abstract idea of allowing players to purchase additional objects during a game" misses important claim limitations that go to the essence of the invention and how it is distinguished from merely allowing players to purchase additional objects during a game.

Any alleged "abstract idea" that could possibly be distilled from claim 1 is incomplete without including a programmed computer to effect the twelve foregoing concrete steps (*e.g.*, managing the operation of a computerized game, controlling a

user's gaming action, presenting an offer to purchase a game object dependent upon a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action (*i.e.*, in real time), and supplying game objects without interrupting gaming action (*i.e.*, in real time)).

The claims of the '445 patent, including exemplary claim 1, are directed to specific and concrete methods of managing and controlling gaming actions involving twelve concrete and specific steps such as limiting offers based upon tracked game activity and effecting real-time transactions which allow the purchase and integration of game objects into the game without interrupting the gaming action. They simply are not directed to an abstract idea at all. *See, e.g., U.S. Bancorp v. Solutran, Inc.,* Case No. CBM2014-00076, 2014 WL 3943913 (PTAB Aug. 7, 2014) (holding that systems and methods for processing checks were not directed to abstract ideas). Thus, the District Court erred in finding the claims to be directed to an abstract idea.

**B. Even if the District Court was correct in distilling an abstract idea from the '445 claims, the abstract idea that it distilled was erroneously broad, thus causing the District Court to erroneously conclude that the '445 claims failed to provide "meaningful space" for gaming activities, and that they would effect a "disproportionate" burden on one's ability to practice the abstract idea.**

Even if the District Court was correct in distilling an abstract idea from the '445 claims, the abstract idea that it distilled – *i.e.*, "allowing players to purchase additional objects during a game" – was erroneously broad. A0008. The overbreadth

in the District Court's statement of any abstract idea causing it to erroneously conclude that the claims failed to provide "meaningful space" for gaming activities, (A0010), and that they would effect a "disproportionate" burden on one's ability to practice the abstract idea. (A0010).

Thus, assuming *arguendo* that the '445 claims embody any abstract idea, when properly looking at each claim as a whole as *Mayo* requires, one must take into account the twelve distinct steps noted above. Without limitation, twelve concrete steps – especially at least managing the operation of a computerized game, controlling a user's gaming action, presenting an offer to purchase a game object dependent upon a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action (*i.e.*, in real time), and supplying game objects without interrupting gaming action (*i.e.*, in real time) – need to be embodied in any statement of any abstract idea embodied by the '445 claims. In particular, the "tracked activity" limitation on the offer (including as required by claims 15 and 17) made by the programmed computer within the computer managed and controlled game, and the real-time (*i.e.*, without interruption), in game purchase of game objects which are integrated into the game in real time, are significant aspects of the claims, and these "tracked activity" and/or real time requirements would necessarily be included in any expression of an abstract idea embodied by the claims.

Because the abstract idea distilled by the District Court was erroneously broad, it erroneously concluded that the claims failed to provide "meaningful space" for gaming activities, and that they would effect a "disproportionate" burden on one's ability to practice the abstract idea. The District Court's order should be reversed or, at a minimum, this Court should clarify the proper breadth of any abstract idea embodied in the claims and remand this case to the District Court for a determination of whether there is enough "more" than that abstract idea for patentability.

### C. The District Court erred in failing to find that, at a minimum, meaningful limitations or the "inventive concept" in the claims render them patentable.

Under *Alice,* a claim directed to an abstract idea may nonetheless be patentable if "additional elements" supply an "inventive concept" in the physical realm of things and acts—a "new and useful application" of the ineligible matter in the physical realm—that ensures that the patent is directed to something "significantly more than" the ineligible matter itself. *Alice*, 134 S.Ct. at 2355, 2357. This "inventive concept" was referred to as "meaningful limitations" in the *Mayo* case (*Mayo*, 132 S.Ct. at 1294, 1299-1300) which was the terminology used by the District Court in its pre-*Alice* opinion.

Collectively, the twelve foregoing concrete steps (*e.g.*, a programmed computer managing the operation of a computerized game, controlling a user's

gaming action, presenting an offer to purchase a game object dependent upon a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action (*i.e.*, in real time), and supplying game objects without interrupting gaming action (*i.e.*, in real time)), provide "meaningful limitations" and an "inventive concept" that should render patentable any alleged abstract idea embodied with the claims.

In particular, the real-time (*i.e.*, without interruption), in-game purchase of game objects which are integrated into the game *in real time*, is a novel limitation that is not found in the prior art. As noted above, the closest prior art was the Rashkovsky patent. The Examiner wrote that, Rashkovsky "teach[es] interrupting game play to allow a user to purchase objects related to a game such as action figures." FH51. Indeed, the language cited by Examiner from the Rashkovsky patent discloses a system in which advertisements may be viewed while the game is "paused" and purchases of associated items may be made *after the game is over*.

After the seventh office action, which was based upon Rashkovsky, the Applicant and Examiner had an interview (FH168-171), wherein they discussed "suggested features that Examiner feels best characterizes system, including: By offering the [game object] feature in this manner back-end financial processing is avoided and the user has 'real-time' and instant access to the feature. While the user is playing the game is updated by adding the new feature and the user continues play

with the new feature." FH171. Thereafter, Applicant amended the claims to add the "without interrupting" limitation, FH111-122, and they were allowed. FH47-53. The Examiner wrote that, Rashkovsky "teach[es] interrupting game play to allow a user to purchase objects related to a game such as action figures." FH51.

Aside from the meaningful and significant "tracked activity" limitation on the offer made by the programmed computer within the computer managed and controlled game, the real-time (*i.e.*, without interruption), in-game purchase of game objects which are integrated into the game *in real time*, is a novel limitation not found in the prior art. The collective twelve limitations of the claims, including in particular the "tracked activity" and "without interruption" limitations alone or in combination, provide sufficient "meaningful limitations" and "inventive concept" that should render patentable any alleged abstract idea embodied with the claims.

The claim limitations noted above, including a computer managing and controlling gaming action, restricting offers by tracked activity, and conducting transactions in real time without interrupting the gaming action, are not mere pre- or post-solution activity of an abstract idea of "allowing players to purchase additional objects during a game." Nor are they conventional. To the contrary, they are integral to the claims and to distinguishing them over prior art gaming methods, including constituting a significant improvement over the Rashkovsky wherein game play was interrupted in order for the user to conduct the monetary transaction necessary to

purchase a game object.  At a minimum, the District Court erred in concluding that points of novelty that distinguished the claims over the prior art were conventional, overbroad, or meaningless.

The correct test, which was not properly applied by the District Court, is whether "additional substantive limitations ... narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1282 (2013) (citing *Mayo*, 132 S.Ct. at 1300; *Bilski*, 130 S.Ct. at 3231; *Diamond v. Diehr*, 450 U.S. 175, 187 101 S.Ct. 1048, 67 L. Ed. 2d 155 (1981)).  As noted below, no such preemption is present due to the substantive and novel limitations in the claims of the '445 patent.

For at least these reasons, including the District Court's failure to appreciate the novelty, narrowness, and significance of the "tracked activity" and "without interruption" limitations in a computer controlled game, the District Court erred in finding that "when taken as a whole they are nothing more than the general practice necessary to execute the abstract idea."  Clearly, the abstract idea stated by the District Court would be implemented in a number of ways without utilizing the novel steps of the '445 claims.  These specific and concrete steps, including in particular the "tracked activity" and "without interruption" steps in a computer controlled game, are neither conventional, nor are they highly general.

**D. The District Court's "meaningful space" test is legally erroneous. Alternatively, the District Court erred in holding that the '445 claims failed to provide "meaningful space" for gaming activities.**

The District Court noted that "Gametek offers the following examples of activity that would not be preempted by its claims: (1) offering to sell game objects not being dependent upon the user's demographics or tracked activity in the game; (2) purchasing of game objects that interrupt the user's gaming action; (3) interrupting the user's gaming action to supply purchased game objects; or (4) incorporating game object into games." (A0010).  The District Court seemed to agree that such gaming would not be preempted; however, the District Court found these points to be unpersuasive because it concluded, erroneously, that the claims fail to leave "meaningful space for a third party to practice the abstract idea of allowing a user to purchase an object for use in the course of game play." (A0010).

In the first instance, "meaningful space" is not the correct test.  For this reason alone, the District Court's decision should be reversed or, at a minimum, be remanded for reconsideration under the proper test.  The correct test is whether the claims "preempted all applications of an abstract idea" *Mayo*, 132 S.Ct. 1289.  The District Court acknowledges that the claims do not preempt all applications of the overbroadly-stated abstract idea of "allowing players to purchase additional objects during a game," and indeed they clearly do not.

In any event, the '445 claims do not preempt (or fail to provide "meaningful

space") to all applications of the abstract idea stated by the District Court. The claims are limited to methods of a programmed computer managing a game and controlling game activity wherein offering to sell game objects are dependent upon the user's demographics or tracked activity in the game, purchasing of game objects are made in real time without interrupt the user's gaming action, with the purchase game objects being integrated into the game in real time. None of the claims preempt in-game purchases generally.  They both provide unique and detailed methods with concrete steps to be applied to facilitate a single method of in-game purchases.

Unlike the invalidated claims in *Benson*, *Flook*, and *Bilski*, the claims of the '445 patent do not broadly cover all in-game purchases in a game, nor do they monopolize steps necessarily inherent in making an in-game purchase. Instead, they "confine[ ] the claims to a particular, useful application," *Mayo*, 132 S.Ct. at 1300, and the claims "seek only to foreclose from others the use of [the abstract idea] in conjunction with all of the other steps in their claimed process," *Diehr*, 450 U.S. at 187. These are not like the claim in *Benson*, which was "so abstract and sweeping" that it could cover usage in a variety of other settings. *Benson,* 409 U.S. at 67. Nor are they as abstract as the three-step alarm system claimed in *Flook*.  *Flook*, 437 U.S. at 585. The steps disclosed are narrow and they confine and tie down only the otherwise abstract processes described in the claims.

Although the District Court's "meaningful space" test is somewhat akin to the

issue of preemption, the District Court erred in holding the '445 claims invalid without finding that they preempt all applications of a correctly stated abstract idea. Alternatively, any arguably implicit holding that the '445 claims preempt all applications of an abstract idea was erroneous because the claims simply do not preempt all, or evening meaningfully all, applications the abstract idea defined by the District Court.

### E.  The District Court erroneously held that the "tracked activity" limitation in the claims effects a "disproportionate" burden on gaming.

Citing *Mayo,* the District Court erroneously held that, "[w]hile a seller could, of course, offer goods to a potential buyer without prequalifying the buyer or otherwise knowing anything about him or her, to preclude such a common-sense first step would effect a 'disproportionate' burden on a third-party's ability to practice the abstract idea." (A0011).  First, the District Court erroneously confused limiting offers to "tracked activity" in gaming action to "prequalifying the buyer or otherwise knowing anything about him or her."  The former is significantly narrower than the latter.  The claims simply do not provide that any just prequalification will suffice for offers of in game objects, and the novel "tracked activity" limitation is sufficiently narrow to avoid placing a "disproportionate" burden on gaming activities.  For example, a game could preface offers of in-game objects on anything other than the user's tracked activity, and further it could conduct currency purchase transactions (as was done in the prior art) by pausing or otherwise interrupting the

game for the transaction to occur.

Further, *Mayo*'s "disproportionate" burden language is merely part of its prohibition against preempting all applications of an abstract idea. *See Mayo,* 132 S.Ct. at 1294, 1302.  It was improper for the District Court to focus on a single limitation in a vacuum and conclude it runs afoul of *Mayo*.  When the claims are properly viewed as a whole, as required by *Mayo*, including with their "without interrupting" limitations, any potential overbreadth from the "tracked activity" limitation is further curtailed.  Further, as discussed in detail above, the '445 claims do not place a "disproportionate" burden on any correctly stated abstract idea, nor do they preempt all applications of any such abstract idea.

**F.  The District Court erred in holding that the purchasing steps (e to g) are "akin to the purchasing steps in *Bilski* to provide a commodity to a consumer."**

The District Court wrote that "the purchasing steps (e to g), by which a practitioner of the claimed method might provide a game object to a user, are akin to the purchasing steps in *Bilski* to provide a commodity to a consumer." (A0012).  It also wrote that "[t]he '445 claims divide that single step into three commonsense components: offering the good at a set price, accepting the offer, and supplying the good to the buyer." *Id.*  Both assertions are erroneous.

The *Bilski* claims do indeed recite the step of "initiating a series of transactions between said commodity provider and consumers of said commodity wherein said

consumers purchase said commodity at a fixed rate based upon historical averages." *Bilski*, 130 S.Ct. at 3223–24.  However, the '445 claims do not.

The District Court failed to appreciate that the '445 claims comprise the programmed computer managing the game and controlling the user's gaming activity only presents offers dependent the "tracked activity" of the user's gaming action, the game environment at the time, or the user's set of demographics.[7] Further, the '445 claims require that the purchase transaction be done in real time "without interrupting the gaming action of the at least one user."

At a minimum, the "tracked activity" (step e of claim 1) and "without interrupting" (*i.e.*, real time) (steps f and g of claim 1) aspects of the game object offer and purchase process are significant limitations that distinguish the '445 claims from the generic purchase transaction in *Bilski*.

### G. The District Court erroneously found that the claim limitations are "nothing more than a teased-out version of the basic steps of any commercial transaction."

The District Court further erroneously found that the offer and purchase steps in the '445 claims "are nothing more than a teased-out version of the basic steps of any commercial transaction: a seller offers an item for sale to an interested and able buyer, the buyer accepts that offer, and the seller then provides the item in exchange

---

[7] Claim 1 permits the offer to be dependent upon any of three such parameters.  In contrast, claims 15 and 17 require offers to purchase game objects to be dependent upon tracked activity.

for valuable consideration." (A0011).  Here, the District Court failed to appreciate the significance of a computer controlled game wherein the user's tracked activity (or demographic profile) is a precondition for the offer, and wherein the transaction occurs in real-time without interrupting the gaming action.  Using a user's tracked activity in a game for selecting offers to present to the user is not a basic step in any commercial transaction.  Also, effecting the purchase and supply of an integrated game object into the game in real time without interrupting a user's gaming action is not a basic step in any commercial transaction.

For similar reasons, the District Court erred in finding that "step (a) ('tracking the activity' of a potential buyer) is inherent in identifying potential buyers, just like the claimed step in *Bilski* of "identifying market participants." *Bilski*, 130 S.Ct. at 3224.  To the contrary, the claims do not identify offerees for in-game purchases by identifying game participants.  They identify offerees for in-game purchases based upon the tracked activity of users.  The distinction is substantial and meaningful.

**H. The District Court erred in failing to appreciate how implementation of the method steps by means of a computer differs substantively from non-computer gaming methods.**

The District Court wrote that neither the claims nor the specification provides any details on "how implementation of the method steps by means of a computer would differ substantively from non-computer practice." (A0006).  This assertion is erroneous.  To the contrary, the twelve steps outlined above cannot be performed

with non-computer practice. Without limitation, a programmed computer is required to manage the operation of a game, to control a user's gaming action, to effect a real time purchase transaction for consideration having a monetary nexus without interrupting the gaming action, and to incorporate a purchased game object into a computer controlled game. *See* claim 1, *supra*.

Although just adding a "computer" to a claim does not in itself confer patentability, the District Court failed to appreciate how a computer is necessary for implementation of the '445 claims. Without limitation, the steps of managing the operation of a game and controlling a user's gaming actions are not steps conventionally able to be performed in a non-computer practice. The step of managing the operation of a game as claimed must be performed by a computer. As for the step of controlling a user's gaming actions, this step must also be performed by a computer, including because the user is specifically interacting with a computer (which is managing the operation of the game) and that computer is responsible for, and necessary to, track, update and control the gaming actions of the user. In combination, it is that much clearer that the '445 claims are not simply claims found in a non-computer practice, but that the computer is necessary to both manage the operation of the game and control the user's gaming actions so that these steps work together in the games discussed in the patent.

Thus, taken individually or in combination, the '445 claim elements *do* differ

significantly from non-computer practice and require the implementation of a computer to perform the claimed steps.

### I. The District Court erred in finding that the '445 claims fail to satisfy the machine-or-transformation ("MOT") test.

The District Court erred in finding that the '445 claims fail to satisfy the MOT test.   As part of the holistic analysis required by *Bilski*, the "machine or transformation" test serves as a useful non-dispositive "investigative tool." *Bilski*, 130 S.Ct. at 3227. The machine or transformation test asks if a claimed process is (1) tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing. *Id.* at 3225-26. Further, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope…." *Id*. This Court has stated that a machine "includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." *In re Ferguson*, 558 F.3d 1359 (Fed. Cir. 2009).  Under this Court's broad definition of "machine," a programmed computer, such as the one described and claimed in the '445 patent, is a machine.

Exemplary claim 1 (and the other claims as well) satisfies the MOT test, because it is tied to a particular machine or apparatus; here, the programmed computer that performs the twelve steps set forth above – *i.e*., a special purpose computer. *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010). In *SiRF*, this Court found that the claims were properly directed to

patentable subject matter, because they explicitly required the use of a GPS receiver and could not be performed without its use. *Id.* at 1333. Similarly, as explained above, the claimed invention of the '445 patent cannot be performed without a computer, including a computer controlling the gaming action, making offers based upon tracked activity, and effecting a real-time purchase transaction resulting in a game object being integrated into the game, all done without interrupting the gaming action.

Further, the '445 claims satisfy the "transformation" prong of the MOT test because they apply to manipulations of nonphysical data. This Court has explained that: "[t]he raw materials of many information-age processes ... are electronic signals and electronically manipulated data ... [raising the question of] [w]hich, if any, of these processes qualify as a transformation or reduction of an article into a different state or thing constituting patent eligible subject matter?" *In re Bilski*, 545 F.3d 943, 952 (Fed. Cir. 2008) (en banc). In *In re Bilski,* this Court held that the data manipulated must transform either a "physical object or substance, or an electronic signal representative of any physical object or substance." *Id.* at 964.

In the '445 claims, a game object which is purchased and incorporated into a game is a different state or thing, as well as the game itself being brought to a different state or thing by incorporation of the game object. Further, the '445 claims meet the transformation prong as the computer associated with the game is

transformed into a different logical state. The process transforms a programmed computer managing a game from a logic state wherein, without limitation, activity is tracked, a purchase account is created, a game object is purchased, and a game object is incorporated into the game. The game object, *e.g.*, "virtual good," is representative of a physical object or substance, and thus meets the test set forth in *In re Bilski*. Further, when the game object is incorporated into the game, there is a different logical state of the game object, and indeed of the game itself.

Further, for example, the '445 patent claims a method which, when practiced, converts electronic currency into virtual goods, thus converting an electronic signal representative of the currency into a different electronic signal representative of a virtual good. When the user purchases the virtual good, the computer processes the data (electronic signals) for the user's account representative of currency to convert that currency into an object in the game (the virtual good). In contrast to a simple purchase-exchange in a physical store where currency is traded for goods, the computer is necessarily converting electronic signals to identify that the currency is being converted into the virtual good.

Moreover, once the computer has converted the currency into the virtual good, the computer places that virtual good into the game by further converting electronic signals (such as the data stored about the user's game world) to now indicate that the user has the purchased virtual good in their game world. Thus, even under the

transformation analysis, the '445 claims necessarily require that a computer manipulate and transform electronic signals involved in the user's game being managed and controlled by the computer as explained above.

## VIII. CONCLUSION AND PRAYER

For the reasons stated herein, Plaintiff-Appellant GT Gaming LLC (f/k/a Gametek LLC) respectfully submits that the District Court's determination of unpatentablity based upon 35 U.S.C. § 101 was erroneous, contrary to the law, and contrary to the facts as set forth in the '445 patent, and thus it must be reversed.

Dated: September 12, 2014        Respectfully submitted,

*/s/ John J. Edmonds*
John J. Edmonds
Stephen F. Schlather
Shea N. Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone:  (281) 501-3425
Fax:  (832) 415-2535
jedmonds@cepiplaw.com
sschlather@cepiplaw.com
spalavan@cepiplaw.com

ATTORNEYS FOR PLAINTIFF-
APPELLANT GT GAMING LLC
F/K/A GAMETEK LLC

## VII.    CERTIFICATE OF SERVICE

I, John J. Edmonds, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On September 12, 2014 a copy of the foregoing Corrected Opening Brief of Plaintiff-Appellant was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users. Paper copies will also be sent to all opposing counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the electronically filed document, six paper copies will be filed with the Court via courier within the time provided by the Court's rules.

Dated: September 14, 2014                    */s/ John J. Edmonds*
                                             John J. Edmonds

                                             COLLINS, EDMONDS, POGORZELSKI,
                                             SCHLATHER & TOWER, PLLC

## VIII.    CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>9,085</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated: September 12, 2014          */s/ John J. Edmonds*
                                  John J. Edmonds

                                  COLLINS, EDMONDS, POGORZELSKI,
                                  SCHLATHER & TOWER, PLLC

## ADDENDUM

1. MEMORANDUM OPINION AND ORDER IN C.A. 3:13-CV-02546-RS (*GAMETEK LLC V. ZYNGA, INC.*) (DKT. NO. 82)..............................A0004

2. MEMORANDUM OPINION AND ORDER IN C.A. 3:13-CV-03089-RS (*GAMETEK LLC V. FUNZIO, INC., ET AL.*) (DKT. NO. 85) ..............A1811

3. MEMORANDUM OPINION AND ORDER IN C.A. 3:13-CV-03472-RS (*GAMETEK LLC V. ELECTRONIC ARTS, INC.*) (DKT. NO. 89)........A2685

4. MEMORANDUM OPINION AND ORDER IN C.A. 3:13-CV-03493-RS (*GAMETEK LLC V. CROWDSTAR INTERNATIONAL LTD.*) (DKT. NO. 69) ..........................................................................................................A3555

5. FINAL JUDGMENT IN C.A. 3:13-CV-02546-RS (*GAMETEK LLC V. ZYNGA, INC.*) (DKT. NO. 83) ................................................................A0001

6. FINAL JUDGMENT IN C.A. 3:13-CV-03089-RS (*GAMETEK LLC V. FUNZIO, INC., ET AL.*) (DKT. NO. 86)................................................A1808

7. FINAL JUDGMENT IN C.A. 3:13-CV-03472-RS (*GAMETEK LLC V. ELECTRONIC ARTS, INC.*) (DKT. NO. 90) .........................................A2682

8. FINAL JUDGMENT IN C.A. 3:13-CV-03493-RS (*GAMETEK LLC V. CROWDSTAR INTERNATIONAL LTD.*) (DKT. NO. 70) .....................A3552